The STATE of Ohio, Appellee,

v.

COOPER, Appellant.

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2001–03–063.

Decided Feb. 19, 2002.

118

Robin N. Piper, Butler County Prosecuting Attorney, Daniel G. Eichel and Craig D. Hedric, Assistant Prosecuting Attorneys, for appellee.

James T. Cooper, for appellant.

---

POWELL, Judge.

{¶ 1} Defendant-appellant, John C. Cooper, appeals his conviction in the Butler County Court of Common Pleas for involuntary manslaughter. For the reasons that follow, we affirm in part and reverse in part the judgment of the trial court.

{¶ 2} Ashley Smith was born on November 26, 1990, to Thera Evans. Appellant was Evans's fiancé, but he was not Ashley's biological father.

{¶ 3} On December 23, 1990, Evans left Ashley in the care of appellant so that she could shop for her mother's Christmas gift. Ashley had been fussy most of the day and would not eat. Evans was gone between forty-five minutes and one hour. When Evans returned, Ashley was acting differently. She was crying inconsolably and she had a mark on her cheek. When Evans questioned appellant about Ashley's abnormal behavior, he explained that he was bouncing the baby on his knee, which caused her head to swing backward and forward.

{¶ 4} Appellant attempted unsuccessfully to console Ashley by placing a cold wash rag on her head. Ashley cried throughout the night and she would not eat. The next morning, Ashley was taken to a local hospital. After an examination, she was immediately transferred to Children's Hospital Medical Center in Cincinnati.

{¶ 5} The doctors placed Ashley in intensive care because she required assistance with her bodily functions, including breathing. A computed tomography scan revealed that Ashley suffered from intracranial and retinal hemorrhaging, which was causing severe brain damage. Robert J. Lerer, M.D., Ashley's attending physician, suspected that the hemorrhaging was the result of someone shaking Ashley violently. Every physician who saw Ashley similarly diagnosed her as a victim of "shaken baby syndrome." [1]

{¶ 6} Ashley's injuries resulted in spastic cerebral palsy and severe mental retardation. Although Ashley lived for nine years, she was never able to do anything on her own. Physically, she remained drawn into a fetal position. For most of her life, Ashley had to be fed through a tube because she lost her ability to swallow. Ashley's mental capacity never surpassed that of a six-month-old child. Her only verbal responses were laughing, crying and moaning.

{¶ 7} Ashley died in the care of her adoptive family on October 31, 1999. An autopsy conducted at the direction of the Butler County Coroner indicated that Ashley died of "cystic encephalomalacia due to subarachnoid hemorrhage." In other words, a hemorrhage caused a complex mass of cysts to fill the cerebral hemispheres around Ashley's brain. The coroner noted that the cause of the condition was "child maltreatment" or "shaken baby syndrome."

{¶ 8} Appellant was indicted on one count of involuntary manslaughter. He pled not guilty to the charge. After a trial to the bench, appellant was found

---

1. Generally, "shaken baby syndrome" refers to a series of injuries to the brain that result from violently shaking a small child, whose weak neck muscles permit tremendous movement of the brain within the skull.

guilty as charged and sentenced accordingly. Appellant appeals his conviction and sentence, and raises eight assignments of error for review.

{¶ 9} Assignment of Error No. 1:

{¶ 10} "The finding of guilt in the case *sub judice* was not supported by sufficient evidence and the trial court erred by overruling motions for acquittal raised by defendant–appellant."

{¶ 11} In his first assignment of error, appellant contends that the state produced insufficient evidence to convict him of involuntary manslaughter. Specifically, appellant argues that the state failed to prove that he was guilty of child endangering as a predicate offense for involuntary manslaughter. In support of his argument, appellant notes that it is equally likely that Evans caused the injury to Ashley.

{¶ 12} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. After viewing the evidence in a light most favorable to the prosecution, the relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. A court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

{¶ 13} The state can use either direct evidence or circumstantial evidence to prove the elements of a crime. See, e.g., *State v. Durr* (1991), 58 Ohio St.3d 86, 92, 568 N.E.2d 674. Circumstantial and direct evidence are of equal probative value. *Jenks* at paragraph one of the syllabus.

{¶ 14} Appellant was tried on one count of involuntary manslaughter in violation of R.C. 2903.04, which states: "(A) No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." The state charged that appellant's act of involuntary manslaughter was predicated on the offense of endangering children in violation of former [2] R.C. 2919.22(B)(1). To establish a violation of R.C. 2919.22(B)(1), the state must prove, beyond a reasonable doubt " '(1) that the child is under

---

2. Since the state alleged that the criminal acts committed by appellant for the predicate offense occurred in December 1990, the version of the statute in effect at that time must be applied.

eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, (2) an affirmative act of abuse, and (3) which act was reckless, that is, perpetrated with heedless indifference to the consequences of the action.'" *State v. Burdine–Justice* (1998), 125 Ohio App.3d 707, 713, 709 N.E.2d 551, quoting *State v. Bogan* (June 14, 1990), Montgomery App. No. 11920, at 3–4, 1990 WL 80572.

{¶ 15} Appellant does not dispute that the state provided sufficient evidence to prove that Ashley was under the age of eighteen. Therefore, we will examine the record to determine whether the state presented sufficient evidence concerning the second and third elements.

{¶ 16} The second element requires the state to prove that an affirmative act of abuse occurred. Child abuse has been defined as an act that "inflicts serious harm or creates a substantial risk of serious harm to the physical health or safety of the child." *Burdine–Justice* at 714, 709 N.E.2d 551. Child abuse has also been described as "any form of cruelty to a child's physical, moral or mental well-being." *Ivey* at 258, 648 N.E.2d 519.

{¶ 17} At trial, Evans testified that Ashley was acting differently when she returned from shopping. Ashley was "agitated" and would scream anytime that Evans moved her. She cried inconsolably for most of the night and would not take her bottle. Thus, the state presented sufficient evidence to establish that Ashley's injuries occurred when she was in appellant's care on December 23, 1990, while Evans was Christmas shopping.

{¶ 18} Dr. Lerer testified that the first time he saw Ashley at Children's Hospital she was comatose. She was being mechanically ventilated. Her eyes showed signs of retinal hemorrhages. It appeared to Dr. Lerer that Ashley was unable to see and hear. A computed tomography scan revealed that Ashley suffered from intracranial hemorrhaging, which was causing severe brain damage. Dr. Lerer suspected that the hemorrhaging was the result of someone's shaking Ashley violently.

{¶ 19} Robert Shapiro, M.D., the medical director of Children's Hospital's Mayerson Center for Safe and Healthy Children, reported his medical findings pertaining to Ashley. As the head of the child abuse team, Dr. Shapiro was requested to evaluate Ashley when she was admitted to the hospital. Dr. Shapiro testified that he agreed with Ashley's attending physicians in their diagnosis of her as a victim of shaken baby syndrome.

{¶ 20} Richard Burkhardt, M.D., Butler County Coroner, testified that Ashley died because a hemorrhage caused a complex mass of cysts to fill the cerebral hemispheres around her brain. The coroner noted that the cause of the condition was "child maltreatment" or "shaken baby syndrome." Thomas Catalanotto,

M.D., Ashley's physician, also testified that Ashley's death was a result of complications of neurological devastation caused by being violently shaken as a baby.

{¶ 21} Lieutenant Gerald Martin was a detective with the Hamilton Police Department assigned to the Youth Aid Bureau. He testified that appellant gave him a statement during an investigative interview. In his statement, appellant admitted that he "spun [Ashley] around in circles" and "bounced her up and down" on his knee in an effort to quiet her. Appellant described how Ashley's head went back "real far" while he bounced her on his knee. Appellant admitted believing that he hurt Ashley because "she was acting like she couldn't catch her breath" and "her eyes were closed." Appellant described how that night Ashley would not open her eyes or respond. Appellant stated: "[Ashley] was worse than usual in that she was crying a lot and I could not do anything with her. This kind of gets on your nerves and it got me upset I guess."

{¶ 22} Thus, the state's evidence, if believed, establishes that appellant committed an act of abuse during the time when Evans was shopping. This act of abuse caused Ashley severe physical and mental harm. Appellant argues that a trier of fact could conclude from the evidence that Evans had injured Ashley before he had any contact with her. Such an argument concerns the weight of the evidence and the credibility of the witnesses, not the sufficiency of the evidence. The state produced sufficient circumstantial evidence through appellant's own admissions, Evans and Drs. Lerer, Shapiro and Burkhardt from which a reasonable trier of fact could conclude that appellant committed the act of abuse that caused Ashley's injuries.

{¶ 23} The third element to establish a violation of R.C. 2919.22(B)(1) is recklessness. "Existence of the culpable mental state of recklessness is an essential element of the crime of endangering children." *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144, paragraph one of the syllabus. A person acts recklessly when, "with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶ 24} In a child abuse case where an individual, after viewing photographs of her child, stated, "I didn't realize I hit her so hard," this court found that a reasonable trier of fact could infer that the defendant's actions were reckless. *Burdine–Justice,* 125 Ohio App.3d at 715–716, 709 N.E.2d 551. Similarly, in this case, appellant admitted that Ashley got on his nerves and made him upset. In addition, he stated that he bounced Ashley on his knee with enough force that "her head went back real far." Appellant also admitted to tossing a one-month-old baby in the air. A reasonable trier of fact could infer from

appellant's statements and the injuries suffered by Ashley that appellant acted with heedless indifference to the consequences of his actions.

{¶ 25} Appellant contends that the state did not prove that he recklessly disregarded a "known" risk because he did not know that shaking a baby could cause brain damage. Appellant supports his contention by referring to Dr. Shapiro's testimony that fifty percent of lay people probably do not realize that shaking a baby can cause brain damage. However, culpability for the predicate offense of endangering children does not require that appellant have known that his conduct would lead to brain damage or shaken baby syndrome. Rather, it is sufficient that appellant disregarded the known risk that his conduct would lead to abuse in the form of mental or physical harm to a child. There is sufficient evidence in the record that appellant acted recklessly in his treatment of Ashley. Thus, the state introduced sufficient evidence from which a rational trier of fact could conclude that appellant was guilty of child endangering.

{¶ 26} Finally, the state must prove that Ashley's death was a proximate result of the crime of endangering children. The state's witnesses testified that Ashley ultimately died of pneumonia. However, Ashley's doctors consistently testified that the pneumonia was a direct result of the physical harm caused by being shaken as a baby. The harm caused to her as an infant inflicted her with cerebral palsy and neurological devastation of such severity that Ashley was bedridden for her entire life. Since she was confined to a bed and lost her ability to swallow early in her life, Ashley had a tendency to aspirate respiratory secretions, which led to recurrent episodes of pneumonia. Ashley did not survive the last occurrence of pneumonia. Thus, there is sufficient evidence to demonstrate that Ashley's death was proximately caused by appellant.

{¶ 27} Therefore, after viewing the evidence in the light most favorable to the state, we conclude that a rational trier of fact could find the elements of involuntary manslaughter proven beyond a reasonable doubt. Accordingly, appellant's first assignment of error is overruled.

{¶ 28} Assignment of Error No. 2:

{¶ 29} "The finding of guilt in the case *sub judice* was against the manifest weight of the evidence."

{¶ 30} In his second assignment of error, appellant argues that his conviction is against the manifest weight of the evidence. Specifically, appellant contends that the evidence does not establish that the injuries he inflicted upon Ashley when she was one month old proximately caused her death at the age of nine. In addition, appellant contends that the evidence does not establish that he was the one who hurt Ashley.

{¶ 31} A reviewing court will not reverse a judgment as against the manifest weight of the evidence in a bench trial where the trial court could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. *State v. Eskridge* (1988), 38 Ohio St.3d 56, 59, 526 N.E.2d 304; *Middletown v. Ramsey* (Sept. 19, 1988), Butler App. No. CA87–11–149, 1988 WL 96622. The standard for reversal for manifest weight of the evidence has been summarized as follows:

{¶ 32} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717.

{¶ 33} In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 34} We have already concluded that the state presented sufficient evidence to convict appellant of involuntary manslaughter beyond a reasonable doubt. Appellant did not introduce any evidence at trial contrary to the state's evidence. Instead, appellant challenged the credibility of the state's evidence. The trial court was in the best position to judge the credibility of the witnesses and to determine the weight to be given the evidence. Considering the record as a whole, we conclude that the trial court did not lose its way in its resolution of the evidence. Accordingly, appellant's second assignment of error is overruled.

{¶ 35} Assignment of Error No. 3:

{¶ 36} "The guilty verdict in the case *sub judice* was derived solely from an inference based on an inference."

{¶ 37} In his third assignment of error, appellant argues that his conviction is impermissibly derived from an inference based on an inference. Appellant argues that the trial court had to infer that he shook Ashley by inferring that he acted inconsistently with his statement to the police. Based on this inference, appellant contends that the trial court further inferred that the injury to Ashley caused her death.

{¶ 38} A trier of fact may not draw an inference based entirely upon another inference, unsupported by any additional fact or another inference from other facts. *State v. Cowans* (1999), 87 Ohio St.3d 68, 78, 717 N.E.2d 298. Yet a second inference may be drawn upon a previous inference if the second inference is based at least in part on additional facts or inferences drawn from other facts. Id. Since reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process, the rule against stacking inferences is limited only to inferences drawn exclusively from other inferences. *State v. Evans* (Dec. 27, 2001), Franklin App. No. 01AP-594, 2001 WL 1653864, citing *Donaldson v. N. Trading Co.* (1992), 82 Ohio App.3d 476, 481, 612 N.E.2d 754.

{¶ 39} Although inferences arose in this case, none is impermissibly drawn from another. Initially, the inference that appellant caused the harm to Ashley is based on Evans's testimony that Ashley acted differently when Evans returned from shopping. It may also be inferred from appellant's admission that Ashley got on his nerves while he was watching her. Whether appellant caused Ashley's death must be inferred from additional facts: the testimony of Drs. Lerer, Shapiro and Catalanotto and the results of the autopsy as testified to by Dr. Burkhardt. Thus, the inference concerning Ashley's death is a parallel inference based in part on previous inferences and in part on additional facts. The proof does not violate the prohibition against stacking one inference upon another. Accordingly, appellant's third assignment of error is overruled.

{¶ 40} Assignment of Error No. 4:

{¶ 41} "The trial court erred when it admitted testimony by the prosecution's 'expert' witness without proper foundation."

{¶ 42} In his fourth assignment of error, appellant argues that the trial court erred by admitting Dr. Shapiro's testimony "without proper foundation." Citing Evid.R. 703, appellant contends that the trial court failed to assess the "reasoning and methodology" underlying Dr. Shapiro's testimony before permitting it to be admitted at trial.

{¶ 43} Initially, we note that appellant did not object to the foundation of Dr. Shapiro's testimony at trial and therefore has waived all but plain error. Pursuant to Crim.R. 52(B), "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." A plain error within the meaning of Crim.R. 52(B) is an obvious error that is prejudicial to an accused, although neither objected to nor affirmatively waived, which, if allowed to stand, would have a substantial adverse effect on the integrity of and public confidence in judicial proceedings. *State v. Craft* (1977), 52 Ohio App.2d 1, 7, 6 O.O.3d 1, 367 N.E.2d 1221. Under plain error analysis, it must be clear from the record that an error was committed and, except for the

error, the result of the trial clearly would have been otherwise. *State v. Bock* (1984), 16 Ohio App.3d 146, 150, 16 OBR 154, 474 N.E.2d 1228. The plain error rule must be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 4 OBR 580, 448 N.E.2d 452. We find no such error here.

{¶ 44} Pursuant to Evid.R. 702, a witness may testify as an expert if all of the following apply:

{¶ 45} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ 46} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ 47} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  * * *."

{¶ 48} The facts or data in the particular case upon which the expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.  Evid.R. 703.

{¶ 49} The record reveals that Dr. Shapiro is a specialist in pediatric emergency medicine and has been the medical director of Children's Hospital's Mayerson Center for Safe and Healthy Children for many years. The information and medical knowledge that he possesses regarding pediatric emergency care and the incidence of child abuse relate to matters beyond the knowledge and experience possessed by lay persons. In addition, Dr. Shapiro treated Ashley shortly after she suffered her injuries. He has treated and diagnosed other victims of "shaken baby syndrome." The bases for his expert opinions included his personal observations and facts presented at trial through other witnesses. The trial court did not err by allowing Dr. Shapiro to testify as an expert. Appellant's fourth assignment of error is overruled.

{¶ 50} Assignment of Error No. 5:

{¶ 51} "The trial court erred when it admitted irrelevant testimony at trial."

{¶ 52} Assignment of Error No. 6:

{¶ 53} "The trial court erred when it admitted testimony at trial which was substantially more prejudicial than probative."

{¶ 54} In his fifth and sixth assignments of error, appellant again challenges the trial testimony of Dr. Shapiro. Appellant argues in his fifth

assignment of error that Dr. Shapiro's testimony was not relevant. Specifically, appellant contends that Dr. Shapiro testified about irrelevant "unsubstantiated statistics" regarding shaken baby syndrome. Appellant contends in his sixth assignment of error that even if Dr. Shapiro's testimony is relevant, the trial court should have excluded it because its probative value was substantially outweighed by its prejudicial effect.

{¶ 55} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Generally, all relevant evidence is admissible. Evid.R. 402. However, relevant evidence is not admissible where its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Evid.R. 403(A); *State v. Jurek* (1989), 52 Ohio App.3d 30, 35, 556 N.E.2d 1191. Absent an abuse of discretion and a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of relevant evidence. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 19 OBR 330, 483 N.E.2d 1157, certiorari denied (1986), 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Rivera* (1994), 99 Ohio App.3d 325, 328, 650 N.E.2d 906.

{¶ 56} As we have already noted, Dr. Shapiro is a specialist in pediatric emergency medicine and has been the director of Children's Hospital's child abuse team for many years. In addition, Dr. Shapiro treated Ashley shortly after she suffered her injuries. He has treated and diagnosed other victims of "shaken baby syndrome." Dr. Shapiro's testimony was probative because it provided the trial court with expert testimony of how Ashley could have sustained her injuries. Dr. Shapiro's experience in treating other victims of shaken baby syndrome did not amount to "unsubstantiated statistics." Rather, it provided part of Dr. Shapiro's basis of knowledge for his diagnoses of Ashley.

{¶ 57} The probative value of Dr. Shapiro's testimony is indisputable. The question then becomes whether there was unfair prejudice to appellant by allowing him to testify. Unfavorable evidence is not equivalent to unfairly prejudicial evidence. See *State v. Geasley* (1993), 85 Ohio App.3d 360, 373, 619 N.E.2d 1086. Unfairly prejudicial evidence is that which might result in an improper basis for a verdict. See *State v. Bowman* (2001), 144 Ohio App.3d 179, 185, 759 N.E.2d 856. Consequently, evidence that arouses emotions, evokes a sense of horror, or appeals to an instinct to punish may be unfairly prejudicial.

Id. Thus, the decision to exclude evidence under Evid.R. 403(A) involves more than a determination of whether the evidence is merely prejudicial or unfavorable. Id. The evidence must cause unfair prejudice, for if the term "unfair prejudice" simply meant prejudicial or unfavorable, anything adverse to a litigant's case would be excluded under Evid.R. 403. Id.

{¶ 58} Dr. Shapiro's testimony about the likely cause of Ashley's injuries was unfavorable to appellant. However, we cannot conclude that Dr. Shapiro's testimony caused any prejudice to appellant as the term is defined under Evid.R. 403. Nor can the testimony be said to arouse the trial court's emotions, evoke a sense of horror, or appeal to an instinct to punish appellant for his alleged actions. Therefore, we conclude that the probative value of Dr. Shapiro's testimony was not outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion in admitting Dr. Shapiro's testimony. Accordingly, appellant's fifth and sixth assignments of error are overruled.

{¶ 59} Assignment of Error No. 7:

{¶ 60} "The trial court committed so many cumulative errors warranting a reversal of defendant–appellant's conviction."

{¶ 61} In his seventh assignment of error, appellant appears to argue that he was deprived of a right to a fair trial because the trial court committed "so many cumulative errors." Yet appellant fails to indicate a single error that contributes to the alleged accumulation of errors.

{¶ 62} Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives appellant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. However, the doctrine of cumulative error is not applicable where appellant fails to establish multiple instances of harmless error during the course of the trial. *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623.

{¶ 63} This court has found no instance of error in the trial court as set forth in appellant's previous assignments of error. Nor has appellant alleged or established any instances of harmless error. Therefore, the doctrine of cumulative error is not applicable to this case. Appellant's seventh assignment of error is overruled.

{¶ 64} Assignment of Error No. 8:

{¶ 65} "The trial court erred by imposing fines or costs in the case *sub judice.*"

{¶ 66} Appellant argues in his eighth assignment of error that the trial court erred by imposing upon him costs, counsel fees and fines. Appellant contends that the fines are unconstitutionally excessive and improperly imposed without consideration of whether he could pay them.

{¶ 67} In addition to a sentence of imprisonment, the trial court ordered appellant to pay all costs of prosecution and court-appointed counsel costs. Contrary to appellant's assertion, the trial court did not impose any fines upon appellant. Therefore, we will consider only whether the trial court correctly ordered appellant to pay the costs of prosecution and court-appointed counsel costs.

{¶ 68} R.C. 2947.23 specifically provides that "[i]n all criminal cases * * * the judge or magistrate shall include in the sentence the costs of prosecution and render a judgment against the defendant for such costs." Based upon the plain language of the foregoing statute, we conclude that the trial court did not err in assessing costs against the appellant.

{¶ 69} R.C. 2941.51 governs the payment of appointed counsel. R.C. 2941.51(D) provides:

{¶ 70} "The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay."

{¶ 71} Thus, an indigent defendant may properly be required to pay his attorney fees only after the court makes an affirmative determination on the record that the defendant has, or reasonably may be expected to have, the means to pay all or some part of the cost of the legal services rendered to him. See, e.g., *State v. Watkins* (1994), 96 Ohio App.3d 195, 198, 644 N.E.2d 1049; *State v. Groom* (Oct. 19, 2001), Lucas App. No. L–00–1104, 2001 WL 1256311; *State v. Nelson* (Oct. 3, 2000), Shelby App. No. 17–2000–05, 2000 WL 1468820.

{¶ 72} While the trial court did not mention payment of court-appointed counsel fees at the sentencing hearing, the court ordered the appellant to pay them in the judgment entry of conviction. Yet the trial court made no determination on the record that appellant was able to pay or could reasonably be expected to pay for his court-appointed counsel. Accordingly, appellant's eighth assignment of error, as it relates to the court-appointed counsel fees, is sustained.

{¶ 73} We reverse the judgment of the trial court as to court-appointed counsel fees, and affirm the judgment in all other respects. The matter is

remanded to the trial court for a determination of whether appellant is able to pay or can reasonably be expected to pay the costs of his court-appointed counsel.

Judgment affirmed in part,
reversed in part
and cause remanded.

WILLIAM W. YOUNG, P.J., and WALSH, J., concur.